**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

UNITED STATES OF AMERICA,

          -v-                        5:25-CR-416 (AJB)

CARRY BLUNT,

        Defendant.

_____

**Hon. Anthony Brindisi, U.S. District Judge:**

## DECISION and ORDER

### I.    INTRODUCTION

In March of 2025, after being tipped off by a reliable informant, a drug task force opened an investigation into a cocaine dealer in Syracuse. Agents did some early reconnaissance and made a controlled purchase of cocaine using a confidential source. Soon after, they observed their target meet up with an unknown subject inside an SUV. Surveillance observed their mark exit this newcomer's vehicle carrying a concealed object that, to the agents' eyes, looked an awful lot like it could be a brick of compressed narcotics.

The task force took steps to identify the unknown individual from the SUV, who turned out to be defendant Carry Blunt ("Blunt" or "defendant"). Based on their suspicion that the two men had exchanged a wholesale quantity of drugs inside of defendant's vehicle, agents expanded their investigation to look into the possibility that defendant might be an upstream source of the cocaine being distributed in Syracuse.

In September of 2025, after spending several months surveilling both men, Drug Enforcement Administration ("DEA") Task Force Officer Andrew Quinn ("TFO Quinn") swore out an affidavit detailing how the investigation had uncovered an incriminating pattern of activity

consistent with a drug trafficking operation, including frequent-but-quick trips downstate, meetings with other drug traffickers, and a pattern of behavior connected to a suspected stash house.

The contents of TFO Quinn's affidavit convinced U.S. Magistrate Judge Thérèse Wiley Dancks to issue warrants authorizing a search of, *inter alia*, defendant's house, the suspected stash house, several vehicles, and defendant himself.  When agents executed the warrants, they discovered evidence consistent with drug trafficking activity.  Thereafter, a federal grand jury indicted defendant for possession with intent to distribute a controlled substance.

On March 23, 2026, defendant moved pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), seeking to suppress the evidence obtained against him.  Dkt. No. 37.  According to defendant, TFO Quinn's supporting affidavit contains material misstatements and omissions that misled Judge Dancks into issuing the search warrants.  *Id*.  The United States of America (the "Government") opposes the motion, which has been fully briefed.[1]  Dkt. Nos. 41, 48.  The Court heard oral argument on June 1, 2026, in Utica, New York.  Decision was reserved.[2]

## II.    BACKGROUND

The parties have put a total of three search warrant applications in the record.  Defendant, for his part, has offered two documents: (1) the application to search his person and certain locations connected to him, Dkt. No. 37-16; and (2) the application to place a GPS tracking device on a 2015 Hyundai Santa Fe, Dkt. No. 37-19.  Defendant represents that the affidavits in support of

---

[1]  The parties briefed this motion under seal.  At oral argument, the parties agreed to unseal the briefing with appropriate redactions for personal identifying information.  *See* Dkt. Nos. 49, 50.  The Court has attempted to minimize citations to any remaining sealed portions of the record.

[2]  After oral argument, defendant sought leave to submit an untimely affidavit in further support of his motion to suppress.  Dkt. No. 51.  The Government has opposed.  Dkt. No. 52.  That request will be discussed *infra*.

these two search warrant applications were sworn out by TFO Quinn and "are functionally identical" for the purposes of this motion. Dkt. No. 37-15 at 3 & n.1.[3]

As part of its opposition, the Government has offered a third search warrant application to search a 2015 Jeep Grand Cherokee. Dkt. No. 41-7. Although TFO Quinn also swore out this affidavit, it was issued on September 29, 2025, nearly one month after the first two search warrants were issued (and nearly two weeks after they were executed). *Compare* Dkt. Nos. 37-16 *and* 37-19, *with* Dkt. No. 41-7. Because defendant's motion to suppress is based on TFO Quinn's affidavit in support of the first two search warrants, the background recounted here is taken only from what is contained in that affidavit. Dkt. No. 37-16.

In March of 2025, the DEA and the Syracuse Police Department ("SPD") received a tip from an SPD confidential source ("CS #1") that a man named Jaron Flagg ("Flagg") was part of a drug trafficking operation selling cocaine in the metropolitan area of Syracuse, New York. Dkt. No. 37-16 ¶ 6 ("Quinn Aff."). According to CS #1, Flagg lived in the greater Syracuse area and had access to large quantities of cocaine that came from an unknown supplier. *Id*.

CS #1 had an established track record with law enforcement. *See* Quinn Aff. ¶ 6 & n.1. So the task force opened an investigation into Flagg's activities. *See id*. ¶ 5. Agents used public records to figure out that Flagg lived at 214 Scoville Avenue in Syracuse. *Id*. ¶¶ 9–10. And after setting up surveillance on Flagg's residence, agents used CS #1 to conduct the first of several controlled buys from Flagg. *See id*. ¶¶ 8, 13–20.

During the week of March 17, 2025, the task force used CS #1 to make a controlled buy of some cocaine from Flagg. Quinn Aff. ¶ 13. After CS #1 contacted Flagg, the two met up at a pre-arranged location. *Id*. ¶¶ 14–16. Flagg arrived in a 2010 Mercedes Benz SUV with New York

---

[3] Pagination corresponds to individually generated CM/ECF headers.

plates.  *See id.*  CS #1 got into the passenger seat of Flagg's vehicle and came out a short time later with a clear sandwich bag containing a beige chunky substance that later tested positive for cocaine.  *Id.* ¶¶ 16–18.

After this controlled buy, Flagg drove off in the Mercedes Benz.  Quinn Aff. ¶ 19.  Law enforcement tried to follow him, but Flagg drove north into Oswego County and lost the tail.  *See id.*  Agents later sought and received a warrant authorizing them to put a GPS tracking device on the Mercedes Benz, which revealed "daily stops and overnight stays" at Flagg's Scoville Avenue address.  *See id.* ¶ 11.

On March 21, 2025, agents watching Flagg's Scoville Avenue address that evening saw him meet up with an unknown subject driving a 2024 Dodge Durango SUV with Massachusetts plates that was parked nearby.  Quinn Aff. ¶ 20.  Agents observed Flagg exit his house, hop into the Durango's passenger seat and, soon after, exit with a "rectangular-shaped object in his front hoody pocket."  *Id.* ¶ 21.  Based on his "training and experience," TFO Quinn averred that the object in Flagg's pocket "appeared consistent with a kilogram quantity of compressed narcotics."  *Id.*  Flagg got into his Benz and drove away.  *Id.*  So did the unknown subject in the Durango.  *Id.*

The task force soon connected the Dodge Durango to Blunt.  Quinn Aff. ¶ 20 & n.3.  Based on the exchange of drugs they thought they had probably just witnessed between Blunt and Flagg, the task force expanded its investigation to figure out whether Blunt could be tied to the cocaine being sold in the Syracuse area by Flagg.  *Id.* ¶ 22.  Agents set up surveillance on Blunt at his primary residence: 533 Sunflower Drive in Liverpool, New York.  *Id.* ¶ 24.

On June 10, 2025, agents who were still covering Flagg's Scoville Avenue address watched Flagg exit his house and meet up with Blunt "for a short time" inside the Durango, which was

parked in Flagg's driveway.[4]  *See* Quinn Aff. ¶ 29.  After the meeting broke up, Blunt drove the Durango to a local barber shop.  *Id*. ¶ 30.  There, TFO Quinn's affidavit averred that Blunt engaged in behavior consistent with a drug deal:

> Blunt entered the barber shop for a brief period of time before coming back out to the Durango.  Blunt then sat down in the driver's seat and retrieved an object from the driver's side door pocket, which he then began to manipulate in his lap.  A few moments later, Blunt exited the Durango and was observed holding a white substance that appeared to be a portion of plastic containing cocaine.  Blunt placed the substance in his cargo pocket and walked back inside of the barber shop.  After, Blunt exited the barber shop a short time later.  The substance was no longer visible in his pocket, and Blunt was now holding an amount of U.S. currency money in his hand.  Blunt entered his Durango and left the area.

Quinn Aff. ¶ 30 (emphases omitted).  Blunt drove from the barber shop to an apartment building located at 160 Jasper Street in Syracuse, New York.  *Id*. ¶¶ 24, 30.  According to TFO Quinn, surveillance showed that Blunt regularly used Apartment 3 in the Jasper Street apartment building.  *See id*. ¶ 24 & n.4.

The next day, on June 11, 2025, agents watched Blunt meet up with Flagg again.  Quinn Aff. ¶ 31.  Blunt left his Sunflower Drive address and drove the Durango to Flagg's Scoville Avenue house.  *Id*.  There, TFO Quinn's affidavit averred that Blunt likely received money from Flagg in preparation for a trip to purchase drugs downstate:

> Flagg exited the front door of the Scoville Residence, opened the front passenger side door of the Durango, and spoke with Blunt briefly.  Flagg then shut the door and went back inside the Scoville Residence using the front door.  [A few minutes later], Flagg again exited the front door of the Scoville Residence carrying what appeared to be a shoe box.  Flagg placed the shoe box on the front passenger seat of the Dodge Durango and closed the door.  Flagg then entered the side door of the Scoville Residence.  Blunt left the

---

[4]  This paragraph is somewhat ambiguous on this point: it avers that Blunt *and* Flagg exited Flagg's Scoville Avenue address to meet with Blunt in the Durango, but is framed in a way that suggests the affiant meant that only Flagg exited the address.  *See* Quinn Aff. ¶ 29.

> Scoville Residence and travelled to the Jasper Apartment, where he entered the driveway.  Blunt stayed at the Jasper Apartment for approximately 30 minutes before leaving again in the Durango.

Quinn Aff. ¶ 31 (emphases omitted).

Three days later, on June 14, 2025, just after 6:00 a.m., agents watched Blunt leave his Sunflower Drive address and drive off—not in the Durango, but in a 2015 Hyundai Santa Fe with New York plates.  Quinn Aff. ¶ 32.  Law enforcement used data from a network of electronic license plate readers ("LPR") to track the Hyundai's movements.  *Id*. ¶ 33.  According to TFO Quinn, over the course of the next twelve hours, the LPR data showed that Blunt drove the Hyundai from Syracuse down to the New York City area and back.  *Id*. ¶¶ 33–34.

At about 6:20 p.m. that evening, Blunt made it back to Syracuse.  Quinn Aff. ¶ 34.  He drove the Hyundai to the Jasper Apartment building.  *Id*.  Blunt stopped there for about five to ten minutes before driving the Hyundai back to his Sunflower Drive address.  *Id*. ¶¶ 34–35.  After a minute or two, agents watched Blunt move "two reusable bags" from the back seat of the Hyundai into the back seat of a Chevrolet Impala that had been sitting in the driveway of the Sunflower Drive address for the past couple of days.  *Id*. ¶ 35 & n.5.

A few days later, the task force used CS #1 to conduct another controlled buy of some more cocaine from Flagg.  Quinn Aff. ¶¶ 36–42.  After CS #1 made the call, agents watched Flagg exit his Scoville Avenue address, get in his Mercedes Benz SUV, and drive to meet CS #1 at an agreed-upon location.  *Id*. ¶¶ 37–39.  As before, CS #1 entered Flagg's Benz and came out a short time later with a clear sandwich bag containing a beige chunky substance that later tested positive for cocaine.  *Id*. ¶¶ 40–41.  After Flagg drove off, agents tracked his movements.  *Id*. ¶ 42.  According to TFO Quinn, Flagg met briefly with an unknown male subject and "then made several brief stops

to other individuals as he drove around the City of Syracuse," which TFO Quinn believed to be "indicative of drug trafficking activity." *Id*.

On July 2, 2025, agents tracked Blunt as he prepared for what they believed would be another trip downstate. Quinn Aff. ¶ 43. That evening, Blunt drove a white rental van that had been parked at his Sunflower Drive address to the Jasper Apartment building. *Id*. ¶ 44. About an hour later, Blunt exited the Jasper Apartment building "carrying a reusable bag," which he put in the back seat. *Id*. According to TFO Quinn, Blunt was probably picking up cash, since agents believed that Blunt "keeps money collected from customers at the Jasper Apartment until he has enough to take down to NYC to purchase cocaine." *Id*. Afterward, agents followed Blunt to a nearby park. *Id*. ¶ 45. There, he met "with two other known local drug traffickers" and engaged in "quick transactions" that, based on TFO Quinn's "observations and training and experience," appeared to be "narcotics-related (exchanging either cash for cocaine or cocaine)." *Id*.

The next day, July 3, 2025, agents covering Blunt's Sunflower Drive address watched him exit the front door with "a light-colored reusable shopping bag," which he placed in the back seat of the rental van. Quinn Aff. ¶ 46. Blunt drove off in the van and headed to the Jasper Apartment building. *Id*. ¶ 47. There, agents watched Blunt retrieve the shopping bag from the back seat of the van and head inside the apartment building. *Id*. A short time later, Blunt came back outside carrying the same bag, which he put in the trunk of the van before driving off. *Id*. TFO Quinn believed that the "bag contained an unknown object because the bag appeared to be weighted down and Blunt was carrying the bag by its handles." *Id*.

Just before 2:00 p.m. that day, Blunt arrived back at his Sunflower Drive address in the rental van. Quinn Aff. ¶ 48. Agents watched him open the trunk, pull out a "black and red reusable bag," and go inside. *Id*. Blunt came back outside a short time later carrying the same bag, which

he put back in the trunk of the van. *Id*. TFO Quinn believed that Blunt was using the bag to conceal money that he had collected from the Jasper Apartment building and the Sunflower Drive address. *Id*.

A few hours later, the task force received LPR data indicating that the Hyundai had been detected on its way downstate. Quinn Aff. ¶ 49. Over the next several hours, the LPR data showed that the Hyundai traveled downstate toward the New York City area and then made a return trip to Syracuse in the early hours of July 4. *Id*. At about 3:19 a.m. that morning, agents observed the Hyundai arrive at the Sunflower Drive address. *Id*. ¶ 50. According to TFO Quinn, agents saw Blunt exit the driver's seat of the Hyundai and head inside. *Id*.

Later, on July 14, 2025, surveillance showed Blunt arrive at the Jasper Apartment building driving the rental van. Quinn Aff. ¶ 51. Blunt went inside and came out about thirty minutes later carrying a "black and red reusable bag and a black duffel bag." *Id*. He put both bags in the trunk of the van and drove off. *Id*. Blunt drove to his Sunflower Drive address, where an unknown black male had also arrived driving the Hyundai. *Id*. ¶ 52. The time was about 4:15 p.m. *Id*.

Blunt went inside the house and came back out with "the red and black reusable bag," which he put in the trunk of the Hyundai. Quinn Aff. ¶ 52. TFO Quinn believed that this bag "appeared to contain a large rectangular box which was consistent with a shoe box." *Id*. As before, "based on the investigation and [his] training and experience," TFO Quinn believed that the shoe box "likely contained money that Blunt obtained from other local drug dealers to purchase cocaine with." *Id*.

Blunt got into the passenger seat of the Hyundai. Quinn Aff. ¶ 53. The vehicle left the Sunflower Drive address and was soon detected by LPR readers heading downstate. *Id*. ¶ 54. As before, the LPR data showed that the Hyundai traveled downstate to the New York City area and

returned early the next morning.[5]  *Id*.  At around 10:00 a.m., the agents were able to confirm that the Hyundai was still being driven by the unknown black male and that Blunt was still in the passenger seat.  *Id*. ¶ 55.

The Hyundai arrived at an auto lot in Syracuse about thirty minutes later.  Quinn Aff. ¶ 56. There, Blunt and the driver greeted several people in the parking lot.  *Id*.  In the meantime, a second unidentified black male "emerged from the garage area of the auto lot and retrieved a dark-colored duffel bag from the trunk" of the Hyundai.  *Id*.  That guy took the duffel bag back into the garage, where it was not seen again.  *Id*.  Blunt and the unknown driver got back in the Hyundai and drove off.  *Id*. ¶ 57.  They headed to a nearby apartment complex, where the unknown driver exited.  *Id*.

Blunt got into the driver's seat of the Hyundai and drove to the Jasper Apartment building. Quinn Aff. ¶¶ 57–58.  There, Blunt retrieved "a dark colored duffel bag as well as a reusable bag" from the Hyundai.  *Id*.  TFO Quinn believed that this duffel bag was "the same bag Blunt was observed placing in the vehicle prior to leaving for NYC."  *Id*.  Agents watched Blunt carry both bags into the building.  *Id*.  About thirty minutes later, Blunt exited the apartment without the bags and drove off in the Hyundai.  *Id*.

Just before noon, surveillance showed Blunt arrive at his Sunflower Drive address in the Hyundai.  Quinn Aff. ¶ 59.  This time around, the unidentified black male they had seen earlier was a passenger in the front seat.  *Id*.  Both men exited the Hyundai.  *Id*.  Blunt went inside the Sunflower Drive address and the unidentified black male drove off in the Hyundai.  *Id*.

---

[5]  This section of the affidavit indicates that the Hyundai's trip downstate occurred during the evening hours of July 14.  *See* Quinn Aff. ¶¶ 51–54 (detailing events beginning at hours 11:51 through 23:01 on July 14, 2025).  For some reason, however, the affidavit avers that the Hyundai made the return trip in the early hours of that same morning, *i.e.*, July 14.  *See id*. ¶¶ 54–55 (detailing events on "July 14, 2025" beginning at hours 05:22 through 10:05).  The Court chalks this confusion over the chronology up to a scrivener's error and treats this as a "July 14–15 trip."

The next week, beginning on July 20, 2025, the task force used CS #1 to set up another controlled buy of cocaine from Flagg. Quinn Aff. ¶¶ 60–67. After CS #1 made the call, agents watched Flagg exit his Scoville Avenue address, get in his Mercedes Benz, and drive to meet CS #1 at another agreed-upon location. *Id*. ¶¶ 60–64. CS #1 entered Flagg's Mercedes and came out a short time later with a clear sandwich bag containing a beige chunky substance that tested positive for cocaine. *Id*. ¶¶ 65–66. After Flagg drove off, agents lost track of him. *See id*. ¶ 67.

On August 6, 2025, agents surveilled Blunt as he prepared for what they believed would be another trip downstate. Quinn Aff. ¶ 68. Around 1:45 p.m. that afternoon, Blunt showed up at the Jasper Apartment building in a 2015 Jeep Grand Cherokee with New York plates that was registered to "Roberta Blunt" at his Sunflower Drive address. *Id*. & n.8.

Blunt exited the apartment building about thirty minutes later "carrying a black and red reusable bag," which he put in the trunk of the Jeep. Quinn Aff. ¶ 68. He moved a "black duffel bag" from the back seat of the Jeep into the trunk, too. *Id*. TFO Quinn believed, based on his "prior observations during this investigation," that "the bag and duffel bag" contained money. *Id*.

A few hours later, LPR readers detected the Hyundai traveling downstate—notably, though, it is not clear from the affidavit that agents confirmed Blunt's presence in the vehicle for this particular trip. *See* Quinn Aff. ¶ 69. As before, the LPR data showed that the Hyundai traveled to the New York City area and made a return trip early the next morning, *i.e.*, August 7. *Id*.

At around noon that day, Blunt arrived in the Jeep at his Sunflower Drive address. Quinn Aff. ¶ 70. Blunt did not remove any bags from the Jeep after he arrived. *Id*. Because Blunt did not stop at the Jasper Apartment building that morning, TFO Quinn believed that the purpose of this trip downstate "was to bring money to his source of supply in preparation for the purchase of cocaine at a later date." *Id*.

On September 1, 2025, at about 1:00 p.m., agents observed Blunt leave his Sunflower Drive address in the Jeep. Quinn Aff. ¶ 71. About an hour later, Blunt showed up at the Jasper Apartment building in the Jeep. *Id*. ¶ 72. He went inside, came back out about seven minutes later, and then drove off. *Id*. Later, around 3:43 p.m., Blunt drove back to the Jasper Apartment building in the Jeep. *Id*. ¶ 73. He retrieved an "unidentifiable item" from the back seat of the Jeep and went into the apartment building. *Id*. Blunt left the apartment building and came back again at some point later that evening (the exact timeline alleged in the affidavit is inconsistent). *Id*. ¶¶ 73–74.

At about 8:00 p.m., Blunt left the Jasper Street apartment building "with a dark colored duffel bag," which he put in the trunk of the Jeep. Quinn Aff. ¶ 74. Blunt drove off and headed back to Sunflower Drive. *Id*. ¶ 75. In sum, as TFO Quinn avers, "Blunt stopped at the Jasper Apartment building several times on September 1, 2025, carrying various items, and ultimately spent the night at the Sunflower Residence." *Id*.

The next day, on September 2, 2025, around 11:00 a.m., agents watched Blunt leave his Sunflower Drive house and drive off in the Jeep. Quinn Aff. ¶ 76. About an hour later, Blunt arrived at the Jasper Apartment building and went inside. *Id*. He came back out about thirty minutes later, "carrying a light-colored bag and wearing different clothing." *Id*. ¶ 77. Blunt drove off in the Jeep. *Id*.

Two hours later, Blunt came back to the apartment building. Quinn Aff. ¶ 78. But this time around, he was driving the Hyundai. *Id*. Blunt got out of the Hyundai, "retrieved a light-colored bag" from the back seat, and went into the apartment building. *Id*. TFO Quinn avers that this "was the same light-colored bag that Blunt was observed leaving the Jasper Apartment building with earlier in the day." *Id*. About twenty minutes later, Blunt exited the apartment building "with a light-colored object (possibly a bag) and placed it" in the back seat of the Hyundai. *Id*.

Blunt drove off in the Hyundai and headed back to his Sunflower Drive address, where he spent the night. *Id.* ¶ 79.

The next morning, September 3, 2025, at about 1:30 p.m., Blunt drove the Hyundai to the Jasper Apartment building. Quinn Aff. ¶ 80. Based on his "training and experience, and knowledge of this investigation," TFO Quinn believed that Blunt was going to head downstate in the Hyundai later that day. *Id.* ¶ 81. In TFO Quinn's view, Blunt's behavior on September 1 and 2 was consistent with collecting and storing money at the Jasper Apartment building in advance of a trip downstate to purchase cocaine. *Id.*

The task force decided it was time to act. TFO Quinn swore out the challenged affidavit in support of the two search warrant applications. Among other things, TFO Quinn's affidavit averred that Blunt makes regular trips downstate for the purpose of purchasing cocaine to re-distribute in the Syracuse area. Quinn Aff. ¶¶ 23, 26–27. As particularly relevant here, Paragraph 23 of TFO Quinn's affidavit asserts that task force surveillance efforts had confirmed that Blunt had taken <u>fourteen</u> downstate trips since the investigation began in March of 2025:

> Subsequent investigation has revealed that Blunt travels back and forth between Syracuse, NY and New York City, NY (hereafter, NYC) on a regular basis, I believe for the purpose of purchasing large quantities of cocaine to-redistribute in the greater Syracuse Metropolitan area. Specifically, historical LPR data shows that [the Hyundai] has traveled [to] NYC <u>14 times</u> since March 2025. Corresponding surveillance has confirmed that Blunt was in [the Hyundai] either as the driver or a passenger during each of these trips.

Quinn Aff. ¶ 23 (emphases omitted).

Further, TFO Quinn averred that Blunt was using the apartment in the Jasper Street building as a stash house to store money and drugs between trips. Quinn Aff. ¶¶ 24–25, 27–28. TFO Quinn offered a host of reasons to believe that the Jasper Apartment building might be a stash house: Blunt frequently visited the Jasper Apartment building "but does not stay the night there";

he does not have visitors; he always goes inside by himself; the utilities appear to be in someone else's name; he is often seen coming or going from the apartment with "numerous types of bags"; he has been observed going to the apartment right after his trips downstate; and he has not received any mail addressed to him. *Id*. ¶¶ 25(a)–(h).

On September 4, 2025, based on these and other allegations in TFO Quinn's affidavit, Judge Dancks signed warrants that authorized, among other things, the search of: (1) Flagg's Scoville Avenue address; (2) Blunt's Sunflower Drive address; (3) the Jasper Street Apartment; (4) Flagg's Mercedes Benz; and (5) the Hyundai. Dkt. No. 37-16. The warrants also authorized the search of Flagg and Blunt's person, *see id.*, and the placement of a GPS tracking device on the Hyundai, *see* Dkt. No. 37-19.

On September 17, 2025, after using the GPS device to track Blunt's movements as he drove downstate and back in the Hyundai, the task force conducted a vehicle stop and executed the search warrants. Dkt. No. 1 ¶ 3. Agents recovered about six kilograms of compressed, brick-shaped objects believed to be cocaine that were wrapped in plastic and hidden in a "trap" inside the Hyundai's floorboards. *Id*. ¶ 4. They also recovered about two more kilograms of compressed cocaine packaged in the same manner at the Jasper Street apartment, along with some packaging materials and other related drug paraphernalia. *See* Dkt. No. 41-6 at 2–3.

## III.    LEGAL STANDARD

The validity of a search warrant is governed by the Fourth Amendment, which provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.[6]

"[T]he Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Riley v. California*, 573 U.S. 373, 403 (2014). To prevent "general, exploratory rummaging in a person's belongings," *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971), the Fourth Amendment's warrants clause requires every warrant to be particular, sworn, and supported by probable cause. *See, e.g.*, *Groh v. Ramirez*, 540 U.S. 551, 557 (2004).

The probable-cause requirement "is not a high bar." *See, e.g.*, *Kaley v. United States*, 571 U.S. 320, 338 (2014). Probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully reduced to a neat set of legal rules." *Florida v. Harris*, 568 U.S. 237, 244 (2013) (cleaned up) (rejecting "rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach").

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (cleaned up).

Because this standard "requires only a probability or a substantial chance of criminal activity, not an actual showing of such activity," *District of Columbia v. Wesby*, 583 U.S. 48, 57

---

[6] This constitutional provision is composed of two distinct clauses: the reasonableness clause and the warrants clause. *See, e.g.*, Kentucky v. King, 563 U.S. 452, 459 (2011). Although the "reasonableness" requirement is understood today to be "the ultimate touchstone of the Fourth Amendment," *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006), the original draft of this constitutional provision "contained only one clause, which directly imposed limitations on the issuance of warrants." *Payton v. New York*, 445 U.S. 574, 584 (1980).

(2018), "reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause," *United States v. Leon*, 468 U.S. 897, 914 (1984) (cleaned up).  Accordingly, "a search carried out pursuant to a warrant is presumed valid." *United States v. Mandell*, 752 F.3d 544, 551 (2d Cir. 2014) (per curiam) (citation omitted).

These background principles of law significantly restrict the circumstances under which a defendant can challenge the validity of a search warrant.  *See, e.g.*, *United States v. Ventresca*, 380 U.S. 102, 108 (1965) (cautioning against "[a] grudging or negative attitude by reviewing courts toward warrants").  "In certain circumstances, however, a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the warrant and the resulting search or seizure." *United States v. Awadallah*, 349 F.3d 42, 64 (2d Cir. 2003).

## IV.     DISCUSSION

Defendant has moved to suppress "all evidence derived from the search of Mr. Blunt's person, his residence, the Jasper Apartment, and the Hyundai Santa Fe, as well as any evidence derived from the GPS tracking warrant for the Hyundai." Dkt. No. 37-15 at 2.[7]  In defendant's view, "even when considering the totality of the circumstances, the search warrant applications failed to establish a fair probability that Mr. Blunt was engaged in criminal activity." *Id*.  According to defendant, "a hearing is required in this case because the search warrant applications contained materially false statements and omitted other material information that was relevant to the magistrate judge's consideration of whether there was probable cause to issue the warrants." *Id*.

Under *Franks v. Delaware*, 438 U.S. 154 (1978), a defendant is permitted to challenge a sworn affidavit made in support of a search warrant by establishing that it contains deliberately or

---

[7] The parties do not address whether defendant's submissions establish Fourth Amendment "standing" with respect to all of these locations for purposes of his suppression motion.  *See, e.g.*, *United States v. Lewis*, 62 F.4th 733, 741 (2d Cir. 2023) (explaining concept of standing); *United States v. Ray*, 541 F. Supp. 3d 355, 379 (S.D.N.Y. 2021) (applying standing limitation to *Franks* challenge).  The Court assumes without deciding that defendant has done so.

recklessly false or misleading information that was material to the magistrate judge's probable

cause determination.  To overcome the "presumption of validity" that attaches to an affidavit made

in support of a judicially authorized search warrant, a defendant must:

> make a substantial preliminary showing that a false statement know-
> ingly and intentionally, or with reckless disregard for the truth, was
> included by the affiant in the warrant affidavit, and if the allegedly
> false statement is necessary to the finding of probable cause, the
> Fourth Amendment requires that a hearing be held at the defendant's
> request.  In the event that at that hearing the allegation of perjury or
> reckless disregard is established by the defendant by a preponder-
> ance of the evidence, and, with the affidavit's false material set to
> one side, the affidavit's remaining content is insufficient to establish
> probable cause, the search warrant must be voided and the fruits of
> the search excluded to the same extent as if probable cause was lack-
> ing on the face of the affidavit.

*Franks*, 438 U.S. at 155–56 (cleaned up).

"Thus, a defendant seeking to suppress evidence pursuant to an affidavit containing erro-

neous information must satisfy both a state of mind requirement and a materiality requirement by

showing that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate

falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were

necessary to the issuing judge's probable cause finding."  *United States v. Lauria*, 70 F.4th 106,

125 (2d Cir. 2023) (cleaned up).

With respect to the state-of-mind requirement, misstatements or omissions caused by "neg-

ligence or innocent mistakes are insufficient."  *Franks*, 438 U.S. at 171.  Instead, the defendant

must allege that specific portions of the search warrant application contain "deliberately or reck-

lessly false or misleading information," *United States v. Canfield*, 212 F.3d 713, 717 (2d Cir.

2000), and must support those specific allegations of deliberate or reckless misconduct with "an

offer of proof."  *Franks*, 438 U.S. at 171; *see also United States v. Rajaratnam*, 719 F.3d 139, 154

(2d Cir. 2013) (requiring a presentation of "credible and probative evidence").

"Whether the affiant had an intent to deceive is a question of fact." *United States v. Lambus*, 897 F.3d 368, 399 (2d Cir. 2018); *Lauria*, 70 F.4th at 131 (reiterating that "whether an affiant acted negligently or with an intent to 'deceive' or 'mislead' or with a 'reckless disregard for the truth is a factual question'"). In the context of an alleged omission, the defendant must present "credible and probative evidence" that the omitted information "was designed to mislead or was made in reckless disregard of whether it would mislead." *Rajaratnam*, 719 F.3d at 154 (cleaned up).

"Recklessness may be inferred where the omitted information was 'clearly critical' to the probable cause determination." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991). However, a reviewing court should not "automatically draw[ ]" such an inference "simply because a reasonable person would have included the omitted information." *Rajaratnam*, 719 F.3d at 154 (citation omitted). Indeed, "the mere intent to exclude information is insufficient." *Awadallah*, 349 F.3d at 67. As the Second Circuit has cautioned:

> An affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation. However, every decision not to include certain information in the affidavit is 'intentional' insofar as it is made knowingly. If . . . this type of 'intentional' omission is all that *Franks* requires, the *Franks* intent prerequisite would be satisfied in almost every case . . . . [Rather], *Franks* protects against omissions that are *designed to mislead*, or that are made in *reckless disregard of whether they would mislead*, the magistrate.

*Awadallah*, 349 F.3d at 67–68 (quoting *United States v. Colkley*, 899 F.2d 297, 300–01 (4th Cir. 1990)) (emphases in original).

With respect to the materiality requirement, courts engage in "a process of subtraction" (or less commonly, a process of addition) depending on whether the claimed inaccuracies are misstatements or omissions. *See, e.g.*, *Awadallah*, 349 F.3d at 65 (misstatements); *Rajaratnam*, 719

F.3d at 146 (omissions).  In other words, a reviewing court "should disregard the allegedly false statements," *Awadallah*, 349 F.3d at 65, and "insert the omitted truths," *Rajaratnam*, 719 F.3d at 146, and determine whether "there remains a residue of independent and lawful information sufficient to support probable cause," *Canfield*, 212 F.3d at 718.

"If, after setting aside the allegedly misleading statements or omissions, the affidavit, nonetheless, presents sufficient information to support a finding of probable cause, the district court need not conduct a *Franks* hearing."  *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998); *see also United States v. Herrera*, 782 F.3d 571, 573 (10th Cir. 2015) (Gorsuch, J.) (explaining courts enjoy discretion to hold a *Franks* hearing even absent a "substantial preliminary showing").

## A.  The Claimed Misstatements or Omissions

Defendant contends that a *Franks* hearing is necessary because the surveillance notes and pole camera footage disclosed in discovery reveal that the search warrant application "failed to include information material to a determination of probable cause and included information that was materially false or misleading."  Dkt. No. 37-15 at 10.  According to defendant, these "omissions and falsehoods misled the magistrate judge into thinking probable cause existed to believe that Mr. Blunt was engaged in criminal drug activity."  *Id*.

"The *Franks* standard is a high one."  *Rivera*, 928 F.2d at 604.  *Franks* "reflects the Supreme Court's concern that permitting a hearing that impugns the veracity of statements included in a search warrant affidavit without a 'sensible threshold showing' could lead to a 'new large-scale commitment of judicial resources' and the 'misuse of veracity hearings for purposes of discovery or obstruction.'"  *United States v. Sandalo*, 70 F.4th 77, 85 (2d Cir. 2023) (cleaned up) (quoting *Franks*, 438 U.S. at 170).

To be entitled to a *Franks* hearing, a defendant must make "a substantial preliminary show-ing" that (1) the warrant application contains a misstatement or omission; (2) the misstatement or omission resulted from the affiant's intentional or reckless disregard for the truth; and (3) the er-roneous or missing information was material to the finding of probable cause. *See, e.g.*, *United States v. McKenzie*, 13 F.4th 223, 237 (2d Cir. 2021) (misstatements); *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013) (omissions).

Defendant has identified five categories of alleged misstatements or omissions: (1) the in-accurate number of downstate trips in the Hyundai; (2) the false claim that agents observed him carrying bags that contained money; (3) the misleading claim that defendant engaged in "quick transactions" with other drug traffickers in a local park; (4) the failure to disclose that defendant sometimes slept at the Jasper Street apartment; and (5) the omission of other instances in which defendant was seen carrying bags to various locations. Dkt. No. 37-15 at 10–16.

### 1. Downstate Trips in the Hyundai

First, defendant contends that the search warrant application falsely represented that he was present in the Hyundai for each of the fourteen trips between Syracuse and the New York City area. Dkt. No. 37-15 at 10–11 (citing Quinn Aff. ¶ 23). In defendant's view, the search warrant application "described only <u>one</u> instance" in which law enforcement actually confirmed his pres-ence in the Hyundai during a downstate trip: on July 15, 2025. Dkt. No. 37-15 at 11 (emphasis in original) (citing Quinn Aff. ¶ 54). According to defendant, there are "<u>no other</u> descriptions either in the search warrant application or surveillance notes of agents conducting any physical surveil-lance on the Hyundai while it was traveling to or from downstate that would permit them to con-clude Mr. Blunt was in the vehicle." Dkt. No. 37-15 at 11 (emphasis in original).

Defendant emphasizes that his ex-wife, Lisa Blunt, owns the Hyundai and has given defendant and her children permission to use the vehicle whenever they want: she even leaves the keys in the center console "for shared access." Dkt. No. 37-15 at 11 (citing Lisa Blunt Aff., Dkt. No. 37-8). Defendant argues that, without evidence of constant "physical surveillance" of the Hyundai on each and every trip downstate, there was no way to know who might have been driving the vehicle or traveling as a passenger during each trip recorded by the LPR data. *See id.*

Defendant contends that the search warrant application "had to misrepresent" that he was present in the vehicle for each of the Hyundai's fourteen trips downstate because the task force lacked any information about the Hyundai's itinerary in the city. Dkt. No. 37-15 at 11–12. In defendant's view, absent any information about where the vehicle was actually going once it made it to the greater New York City area, the "purported frequency and volume of trips to NYC was critical to establish probable cause." Dkt. No. 37-15 at 11–12. According to defendant, the magistrate judge "would not have been persuaded that the application established probable cause" if TFO Quinn's affidavit had correctly stated that defendant "only drove to NYC *once* in the Hyundai." *Id.* at 12 (emphasis in original).

In opposition, the Government acknowledges that the representation made by TFO Quinn in Paragraph 23 of his affidavit in support of the search warrant application, *i.e.*, that surveillance confirmed defendant's presence in the Hyundai as a driver or passenger for each of the fourteen trips downstate since March of 2025, was inaccurate. Dkt. No. 41-6 at 7 & n.2. Although the Government concedes that defendant has therefore identified a so-called "falsity" for purposes of a *Franks* analysis, the Government maintains that "this error was inadvertent, not intentional." *Id.*

In making this concession of a misstatement in Paragraph 23, the Government has offered a clarifying declaration from TFO Quinn in which he avers that, at the time that he applied for the

search warrant, he believed in good faith that the task force possessed documentation confirming defendant's presence in the Hyundai for each of those fourteen trips.  Dkt. No. 41-6 at 8 (citing Quinn Decl., Dkt. No. 41-8 ¶¶ 3–5).

However, as TFO Quinn explains in this declaration, in reviewing the documentary evidence gathered by the task force in preparation for this motion practice, he "was only able to confirm that the defendant was in his vehicle for 7 of those 14 trips—the three described in [his] warrant affidavit, plus four others."  Quinn Decl. ¶ 4.  According to the Government, TFO Quinn's clarifying declaration confirms that the misstatement was "inadvertent, not intentional."  Dkt. No. 41-6 at 7–8 & n.2 (citing Quinn Decl. ¶ 5).

Further, and contrary to defendant's assertion that the search warrant application only describes a single trip in which Blunt was seen driving the Hyundai downstate, the Government maintains that the warrant application describes three separate instances in which defendant was surveilled traveling to or from the downstate area in the Hyundai: on June 14, 2025, July 3–4, 2025, and July 14–15, 2025.  Dkt. No. 41-6 at 10–11 (citing Quinn Aff. ¶¶ 32–35 (June 14, 2025), 49–50 (July 3–4, 2025), 53–55 (July 14–15, 2025)).  According to the Government, even in the absence of Paragraph 23, the affidavit's description of these three trips established "ample probable cause."  Dkt. No. 41-6 at 11 & n.5.

As an initial matter, the Court agrees with the Government that TFO Quinn's clarifying declaration—in which he concedes that the task force does not in fact possess documentation confirming defendant's presence in the Hyundai as a driver or passenger on all fourteen occasions that the vehicle traveled downstate since March of 2025—establishes a misstatement in Paragraph 23 of the affidavit supporting the search warrant application.  However, at least in this procedural posture, the Court cannot simply "correct" Paragraph 23 of the affidavit by inserting TFO Quinn's

revised factual assertion, *i.e.*, that the task force can confirm defendant's presence in the Hyundai for seven downstate trips (instead of fourteen). *See* Quinn Decl. ¶¶ 4–5.

In *United States v. Lauria*, 70 F.4th 106 (2d Cir. 2023), the Second Circuit rejected the Government's argument that, in the context of a *Franks* challenge, the "corrected affidavit" doctrine "permits the addition of truthful information supporting probable cause that was possessed by investigating officers at the time the warrant was sought." *Id*. at 125. Instead, as the panel explained, "a warrant affidavit may be corrected by supplementation only when the supplemental information detracts from, rather than supports, probable cause." *Id*. at 126 (collecting circuit authorities); *see also United States v. McMurtrey*, 704 F.3d 502, 510 (7th Cir. 2013) (cautioning that district court should not consider "the government's explanation of the contradictions and discrepancies" at the first step of a *Franks* challenge). Because TFO Quinn's revised assertion about Paragraph 23 (about seven trips) would supplement, rather than detract from, the probable cause analysis, it cannot be considered.

Even so, defendant has not established the need for a *Franks* hearing. Recall that to be entitled to one, a defendant must make a substantial preliminary showing of falsity, knowledge, and materiality. *See, e.g.*, *United States v. Sandalo*, 70 F.4th 77, 85 (2d Cir. 2023). The Supreme Court has not defined what qualifies as a "substantial preliminary showing." However, the Court in *Franks* explained that:

> To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.

*Franks*, 438 U.S. at 171.

In other words, although a "substantial preliminary showing" is necessarily something *less* than a preponderance of the evidence (which is the standard the defendant would have to meet to prevail at the evidentiary hearing itself) the threshold showing required to get to an evidentiary hearing in the first place remains non-trivial. *See Sandalo*, 70 F.4th at 101 (Jacobs, J., dissenting) (explaining that circuit authorities characterizing a challenger's initial burden as "high" or "heavy" should not be understood to mean "that a defendant cannot get to a *Franks* hearing without all but establishing that he will prevail"); *see also United States v. Maxwell*, 143 F.4th 844, 854 (7th Cir. 2025) (cautioning that this threshold showing should be considered a "burden of production only").

Measured against this legal standard, defendant has not made a "substantial preliminary showing" with respect to the challenged factual assertions regarding downstate trips in the Hyundai. First, defendant has not offered any non-conclusory basis on which to think that TFO Quinn made the acknowledged misstatement in Paragraph 23 with the requisite state of mind, *i.e.*, that he acted intentionally or recklessly (as opposed to mistakenly or negligently) when he represented to the magistrate judge that task force surveillance had supporting evidence that confirmed defendant's presence in the Hyundai for the fourteen trips downstate since March of 2025.

Nor has defendant shown that the misstatement in Paragraph 23 was "material" to the probable cause determination. Contrary to defendant's claim that the rest of the search warrant application only placed him in the vehicle on <u>one</u> occasion (July 15, 2025), Dkt. No. 37-15 at 11 (citing Quinn Aff. ¶ 54), the Government correctly points out that the affidavit describes <u>three</u> separate instances in which the task force surveilled defendant as he was traveling to or from the downstate area in the Hyundai. Dkt. No. 41-6 at 10–11 (citing Quinn Aff. ¶¶ 32–35 (June 14, 2025), ¶¶ 49–50 (July 3–4, 2025), ¶¶ 53–55 (July 14–15, 2025)).

Keep in mind that *Franks* is not meant to function as a backward-looking test of an affidavit's factual accuracy. *See United States v. Trzaska*, 111 F.3d 1019, 1027 (2d Cir. 1997) ("Every statement in a warrant affidavit does not have to be true."); *see also United States v. Spears*, 673 F.3d 598, 605 (7th Cir. 2012) ("[T]he initial inquiry for *Franks* purposes is not one about how the affidavit can be perfected, it is simply whether the misinformation in the affidavit was included (or the material omission was excluded) with intent or reckless disregard for the truth.").

This is because in *Franks*, the Supreme Court interpreted the Fourth Amendment's warrants clause "as containing an implicit guarantee that the information in a warrant application is 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *McKenzie*, 13 F.4th at 236 (quoting *Franks*, 438 U.S. at 165). In other words, the question is whether the affiant knew the challenged statement was false, or acted with reckless disregard to the statement's truth, at the time that he made the challenged factual representation to the magistrate judge. *See, e.g.*, *United States v. Nejad*, 436 F. Supp. 3d 707, 721 (S.D.N.Y. 2020) (Nathan, J.) (explaining that recklessness inquiry asks whether "affiant in fact entertained serious doubts as to the truth of his allegations *when he initially made them*").

Even putting aside Paragraph 23, defendant's offer of proof does not begin to place in dispute the underlying factual issue of whether he was present in the Hyundai during the three trips described elsewhere in the affidavit, let alone offer any basis on which a fact-finder might conclude that these representations about defendant's presence in the vehicle on those particular occasions were knowingly false or made with reckless disregard for their truth at the time that they were presented to the magistrate judge.

For instance, defendant has offered an affidavit in which he avers that his ex-wife gave him permission to use the Hyundai and that she left the keys in the center console. Carry Blunt Aff.,

Dkt. No. 37-11 ¶¶ 11–12.  Defendant has also submitted an affidavit from his ex-wife confirming that she owns the Hyundai, that she left the keys in it, that other family members had access to it, and that she let other people use it whenever they wanted.  Lisa Blunt Aff., Dkt. No. 37-8 ¶¶ 3–7.

These affidavits show that other people had access to the Hyundai and may have used the vehicle at times.  But these affidavits do not tend to create a fact dispute about defendant's presence in the Hyundai for any of the trips described in the search warrant affidavit.  Defendant's affidavit does not state, for example, "I wasn't in the Hyundai for those trips on those dates."  Nor has defendant offered an affidavit from any of the other family members who allegedly had access to the vehicle who might be able to say "I was in the Hyundai for those trips and defendant wasn't with me."  And even if these affidavits did somehow undermine the *fact* of his presence in the vehicle during those trips (they do not), they would still do nothing to suggest that TFO Quinn might have been lying or acting recklessly when he represented otherwise to the magistrate judge.

This is ordinarily a difficult showing for a criminal defendant to make.  *United States v. Dessart*, 823 F.3d 395, 402 (7th Cir. 2016) (cleaned up) ("*Franks* hearings are rarely held because these elements are hard to prove.").  After all, it involves an agent-affiant's representations about a compilation of investigative information that was gathered over a period of time, usually by a multi-member group of law enforcement officials using a variety of techniques (and done without defendant's knowing involvement in the process).  *See Sandalo*, 70 F.4th at 101 & n.1 (Jacobs, J., dissenting) (explaining some of the practical difficulties imposed by the *Franks* standard).

That is why in certain circumstances, a defendant can raise an inference of deliberate or reckless conduct by showing that an affiant made a series of meaningful factual errors, or even a factual error about a particularly important event that, by itself, undermines probable cause.  *See, e.g., Lauria*, 70 F.4th at 131 ("[T]he pervasiveness of errors could support a finding that certain

misstatements were made deliberately or with reckless disregard for the truth."); *United States v. McKoy*, 2024 WL 3325422, at \*4 (D. Conn. July 8, 2024) ("If a particular statement that is made in a search warrant affidavit finds no support in or is contradicted by the underlying investigative reports and materials, then it may be that there are fair grounds for the defendant to challenge the statement as false.").

For instance, the fact of TFO Quinn's admitted misstatement in Paragraph 23, combined with an offer of proof that actually tended to contradict his factual representations about the other downstate trips, *might* have been enough to warrant a *Franks* hearing. But not every statement made in a warrant affidavit has to be true. And as discussed throughout the rest of this opinion, TFO Quinn's misstatement in Paragraph 23 is simply not enough to raise the necessary inference.

In reply, defendant argues that he is nevertheless entitled to a *Franks* hearing because of deficiencies in the Government's discovery disclosures and ambiguities in TFO Quinn's clarifying declaration. Dkt. No. 48-1 at 2–4. There, defendant "disputes that law enforcement observed Mr. Blunt inside the Hyundai for even seven trips downstate" and complains that TFO Quinn's clarifying declaration does not "provide the dates of those seven trips" or explain how the seven trips match up with the trips that are described in the search warrant application.[8] Dkt. No. 48-1 at 4 (citing Quinn Decl. ¶ 4). According to defendant, "any ambiguity or omission about the dates on which law enforcement observed Mr. Blunt traveling in the Hyundai to downstate New York may be intended to mislead the Court on this issue." *Id*.

These arguments are rejected. It is not the Government's job to make any particular evidentiary showing in support of its search warrant application at this preliminary stage of a *Franks*

---

[8] Defendant attempts to inject further confusion by pointing out that the search warrant application describes a fourth trip downstate on August 6–7, 2025. Dkt. No. 48-1 at 4. That fact is true but irrelevant: the language in the search warrant affidavit is clear that this date tracks the Hyundai but does not place defendant in the vehicle for that trip.

motion—the affidavit is still presumed valid right now.  *See Franks*, 438 U.S. at 171 (recognizing presumption of validity that attaches to warrant affidavit); *see also United States v. Tanguay*, 787 F.3d 44, 53 (1st Cir. 2015) (explaining district court "is entitled to assume that the warrant affidavit is the product of a good-faith investigation and provides a reasonably complete picture of the circumstances relevant to probable cause").

Instead, to get to an evidentiary hearing, it is defendant's job to make a "substantial preliminary showing" of falsity, knowledge, and materiality about specific factual assertions in the affidavit, accompanied by an offer of proof, that undermine probable cause.  *See, e.g.*, *Sandalo*, 70 F.4th at 86; *United States v. Pace*, 898 F.2d 1218, 1227 (7th Cir. 1990) (explaining trial court's initial task on a *Franks* motion involves "sorting through the materials [defendant] submitted, weighing the possible inferences those materials raised, and determining the likelihood that [the affiant] lied [or acted recklessly] in his warrant affidavit").  This threshold burden does not shift to the Government with respect to other factual allegations that were made in the search warrant affidavit merely because TFO Quinn confessed to making a misstatement in Paragraph 23.  To conclude otherwise would penalize the Government and its agents for their candor.

Nor is there some requirement, at least for purposes of *Franks*, that the Government establish to defendant's satisfaction that precise documentary evidence can establish exactly how many trips defendant actually took in the Hyundai during the task force's investigation.  Instead, a *Franks* motion is trying to interrogate a related-but-distinct question: has defendant made a substantial preliminary showing that TFO Quinn was being dishonest or misleading (as opposed to being merely negligent or mistaken) at the time that he represented to the magistrate judge that task force surveillance efforts had placed defendant in the Hyundai for all of those trips downstate?

He has not. Defendant has not offered anything tending to show that TFO Quinn was intentionally or recklessly making a misrepresentation when he averred that task force "surveillance has confirmed that Blunt was in [the Hyundai] either as the driver or a passenger" during the fourteen trips downstate (in Paragraph 23), let alone during the three specific trips that are described in Paragraphs 32–35 (June 14, 2025), 49–50 (July 3–4, 2025), 53–55 (July 14–15, 2025).

To be sure, it is theoretically possible to speculate from TFO Quinn's candid admission about Paragraph 23 that he might have been somehow dishonest or reckless about the task force's due diligence with respect to the other three trips described in the affidavit. But TFO Quinn's clarifying declaration avers that the misstatement in Paragraph 23 was only a good-faith mistake, Quinn Aff. ¶¶ 3–5, and *Franks* requires more than a "mere desire to cross-examine" him about the admitted error. 438 U.S. at 171; *see also United States v. Maxwell*, 143 F.4th 844, 855 (7th Cir. 2025) ("[D]efendants must do more than merely show it is possible to infer the existence of a *Franks* violation—they must present evidence that suggests such an inference is reasonable.").

Defendant has not offered any non-conclusory, evidence-based reason to believe that he could establish at a *Franks* hearing that TFO Quinn possessed a culpable state of mind when he made his initial representation to the magistrate judge about the acknowledged misstatement in Paragraph 23. Nor has defendant offered any non-conclusory basis on which to infer that he could establish falsity and knowledge as to TFO Quinn's representations about the other three trips.

Importantly, whether or not Paragraph 23 is excised from the affidavit, the remaining trips downstate described in the search warrant application, especially when considered together with the other facts and circumstances that were presented to the magistrate judge, were sufficient to establish probable cause. Contrary to defendant's apparent insistence that a search warrant applicant has to show all of their work, courts routinely accept an abbreviated presentation. *See, e.g.*,

*United States v. Ray*, 541 F. Supp. 3d 355, 386 (S.D.N.Y. 2021) ("All storytelling involves an element of selectivity, and a search warrant affidavit need not include every piece of information gathered in the course of an investigation.").

### 2. Defendant Observed Carrying Bags

Second, defendant contends that the warrant application falsely represented that the task force repeatedly observed defendant carrying bags "from one place to another that contained money." Dkt. No. 37-15 at 12 (citing Quinn Aff. ¶¶ 25, 35, 44, 46–48, 51–52, 56, 58, 68, 70, 74, 77–78, 83). Defendant points out that the search warrant application described only a single occasion on which defendant was actually seen with any cash: when he left the barber shop on June 10, 2025. Dkt. No. 37-15 at 12.

As defendant explains, he got his hair cut that day and paid cash. Dkt. No. 37-15 at 12. In defendant's view, walking out of a legitimate place of business with cash in his hands is "not unusual or suggestive of criminal activity." Dkt. No. 37-15 at 12. According to defendant, the warrant application's "repeated suggestion" that defendant had been observed carrying cash on other occasions "misled the magistrate judge into thinking the fact had been established based on observations made by law enforcement." Dkt. No. 37-15 at 13.

In opposition, the Government agrees that the warrant application only described defendant carrying cash once: when he left the barber shop on June 10, 2025. Dkt. No. 41-6 at 12. However, contrary to defendant's claim, the Government emphasizes that TFO Quinn's affidavit does not assert that "any particular bag did, in fact, contain cash." Dkt. No. 41-6 at 12. Instead, as the Government explains, "the affiant sometimes opined, based on the circumstances, his training, and experience, about what he believed some bags could contain—on some occasions, [he] believed the bags could contain money (citing Quinn Aff. ¶¶ 44, 48, 68), and on others, he believed the bags

could contain other or unknown objects (citing Quinn Aff. ¶¶ 46, 47, 51)," and on other occasions, the affiant "put forth no opinion at all about the contents of the bags. ([Quinn Aff.] ¶ 58)."  Dkt. No. 41-6 at 12–13.  According to the Government, TFO Quinn clearly and repeatedly described his basis of knowledge and the surrounding circumstances (including frequent short trips to NYC and covert meetings with others), which the magistrate judge was free to accept or reject as part of her review.  Dkt. No. 41-6 at 13–14.

Upon careful review of the search warrant affidavit, defendant has failed to carry his initial burden with respect to this category of alleged misstatement or omission.  First off, defendant's affidavit does not say anything about his trip to the barber on June 10, 2025.  *See* Carry Blunt Aff., Dkt. No. 37-11.  Instead, in an attempt to justify a *Franks* hearing, defendant has offered an affidavit from the barber himself.  William Brown Aff., Dkt. No. 37-6.  There, his barber avers that defendant got a haircut on June 10, 2025, paid cash, and did not deal any cocaine inside the barber shop on that occasion (or at any other time he saw defendant in the barber shop).  *Id*. ¶¶ 2–8.

These contentions are hardly enough to warrant a *Franks* hearing.  Probable cause is about probabilities—agents usually do not have to discount innocent explanations.[9]  *See United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) ("The fact that an innocent explanation may be consistent with the facts alleged . . . does not negate probable cause."); *see also United States v. Barbosa*, 896 F.3d 60, 71 (1st Cir. 2018) ("As a general rule, a police officer planning to apply for a warrant has no duty to 'investigate a matter fully.'").

To that end, an examination of the search warrant affidavit confirms that the affidavit is scrupulous about *not* saying "these bags *definitely* contain cash."  Instead, TFO Quinn repeatedly offered a series of surrounding facts and circumstances and then averred that, "in his training and

---

[9]  There may be situations where a defendant can show that the officer acted recklessly by ignoring "obvious reasons" to investigate further before seeking a warrant.  *See, e.g.*, *Barbosa*, 896 F.3d at 71.  This is not one of them.

experience, these bags *probably* contain cash." Courts routinely give some weight to an agent's opinion as long as he has offered a basis for his knowledge. *See, e.g.*, *United States v. Fernandes*, 50 F. Supp. 3d 398, 405 (W.D.N.Y. 2014) (collecting cases).

Put differently, TFO Quinn did not "simply describe a pattern of unambiguously lawful activity and then resort to the black box of 'training and experience' to draw the bare conclusion that something criminal must be afoot." *United States v. Peralta*, 361 F. Supp. 3d 313, 322 (N.D.N.Y. 2019). Instead, TFO Quinn "invoked his 'training and experience' in connection with other, independently verifiable factors known to him that pointed toward the likelihood of criminal behavior." *Id*.

The same basic conclusion applies to TFO Quinn's description of defendant's visit to the barber shop. Recall that TFO Quinn's affidavit averred that, shortly after meeting up with Flagg on June 10, 2025:

> Blunt entered the barber shop for a brief period of time before coming back out to the Durango. Blunt then sat down in the driver's seat and retrieved an object from the driver's side door pocket, which he then began to manipulate in his lap. A few moments later, Blunt exited the Durango and was observed holding a white substance that appeared to be a portion of plastic containing cocaine. Blunt placed the substance in his cargo pocket and walked back inside of the barber shop. After, Blunt exited the barber shop a short time later. The substance was no longer visible in his pocket, and Blunt was now holding an amount of U.S. currency money in his hand. Blunt entered his Durango and left the area.

Quinn Aff. ¶ 30 (emphases omitted). Based on these observations and his training and experience, TFO Quinn represented to the magistrate judge that he reasonably believed that defendant had "engaged in a drug deal" inside the barber shop on that date.

This opinion about unlawful drug-related activity is one probable conclusion that could be drawn from the available set of facts. That is true whether or not defendant got a haircut inside

the barber shop on that date.  And that is true even though defendant's barber says that he never

observed his client dealing any drugs inside the barber shop.  Again, *Franks* is not some retrospec-

tive test of an affidavit's factual precision but an inquiry into what the affiant believed to be true,

or appropriately accepted as true, at the time that he made the challenged representation to the

magistrate judge.  *See Franks*, 438 U.S. at 165.

### 3.  Defendant Was Not Observed Engaging in a "Transaction"

Third, defendant contends that the warrant application misrepresented what agents ob-

served on July 2, 2025, when defendant met up with two men at nearby McChesney Park.  Dkt.

No. 37-15 at 13.  Recall that on this specific date, TFO Quinn averred that defendant:

> was surveilled meeting with two other known local drug traffickers
> and engaging in quick transactions which, I believe, based on my
> observations and training and experience to be, narcotics-related
> (exchanging either cash for cocaine or cocaine).  Because he had not
> yet left for NYC on this date, I believe Blunt was collecting money
> for cocaine orders.

Quinn Aff. ¶ 45.

Defendant argues TFO Quinn's use of the word "transactions" materially misrepresented

what agents actually observed that day because the surveillance notes show that "agents did not

observe anything that occurred inside Mr. Blunt's vehicle."  Dkt. No. 37-15 at 13–14.  According

to defendant, "[t]here is nothing in the application or surveillance notes that reflect agents observed

any person with cash or drugs, and neither the driver of the BMW nor the driver of the Ford was

described as exiting Mr. Blunt's vehicle with any objects or bags that may indicate they exchanged

something (e.g., cash or cocaine) with Mr. Blunt."  *Id*. at 14.

Further, according to defendant, TFO Quinn's affidavit "failed to fully describe for the

magistrate judge the relationship Mr. Blunt has with the people whom he met that day."  Dkt. No.

37-15 at 14.  As defendant explains, Kenneth Shelton is Blunt's little brother and works with

- 32 -

defendant "doing community outreach in the county libraries." *Id.* Likewise, Willie Word also works with defendant in the same program. *Id.* In defendant's view, the agents should have known that Shelton is a relative because the pole camera footage of the Sunflower Drive address would show him coming and going from defendant's mother's house, which is right next door. *Id.*

Finally, defendant contends that his "teenaged grandson regularly played pick-up basketball games at [the basketball] courts [at the park] during the summer of 2025, and he would regularly call defendant for a ride home after the games. Dkt. No. 37-15 at 15. As defendant explains, he would show up early and watch some or all of those games from his vehicle in the parking lot, since it was hot outside and much cooler in the air-conditioned vehicle. *See id.* Defendant argues that there is a surveillance camera that appears to be pointing at the parking lot near the basketball courts and that the basketball games are busy events. *Id.* According to defendant, "[i]t is unlikely that anyone would conduct unlawful drug 'transactions' under these circumstances." *Id.*

In opposition, the Government emphasizes that TFO Quinn's affidavit summarized the results of the surveillance that day, which showed that: (1) defendant left the Jasper Apartment building with one of the reusable shopping bags; (2) headed to the park to meet with two men who are known to be drug traffickers; and (3) engaged in "quick transactions" that, based on the agents' training and experience, seemed to be drug-related. Dkt. No. 41-6 at 14–15. The Government's opposition memorandum offers an expanded version of what the surveillance notes showed about this meeting and points out that this was not the only time that agents had seen defendant engaged in this routine—heading from the Jasper Street apartment to the park for quick meetings inside a vehicle. *Id.* at 14–15.

The Government emphasizes that nowhere in TFO Quinn's affidavit does he aver that "anyone saw what happened inside the defendant's vehicle, and he never attempted to describe what

the defendant and the other two individuals did while inside the defendant's vehicle." Dkt. No. 41-6 at 15. Further, the Government argues that it is irrelevant whether defendant might have watched his grandson play basketball at the park because the surveillance notes showed that defendant was only at the park for fourteen minutes on July 2. *Id*. at 16. Finally, the Government maintains that the affidavit accurately described Shelton and Word as known drug traffickers. *Id*.

Upon review of the parties' submissions, defendant has failed to carry his initial burden with respect to this category of alleged misstatement or omission. In an attempt to justify a *Franks* hearing, defendant has offered affidavits from several individuals who describe how the events at the park could be entirely consistent with lawful conduct. For instance, defendant offers an affidavit from his son Quashawn Blunt, who says he does not specifically remember July 2 but thinks that his son (defendant's grandson) might have been playing basketball at the park that day. Quashawn Blunt Aff., Dkt. No. 37-9 ¶¶ 2–8.

Defendant has also submitted his own affidavit saying that he watched some basketball games at the park that summer, would often sit in his air-conditioned vehicle when it was hot outside, and would occasionally talk to people he knew "for a few minutes" as they passed by his car. Carry Blunt Aff., Dkt. No. 37-11 ¶¶ 6–9. There, defendant avers that he recalls meeting with Kenneth Shelton and Willie Word in the parking lot of the park at some point, but asserts that they were working on legitimate projects together. *Id*. ¶¶ 5, 10.

This evidentiary showing does nothing to warrant a *Franks* hearing. A review of the search warrant affidavit makes clear that TFO Quinn did not falsely or misleadingly aver that agents observed anything in particular occur between the three men on July 2. Instead, as with TFO Quinn's conclusion that defendant was likely using bags to conceal cash, the affidavit's statement about "quick transactions" is obviously a conclusion drawn from a constellation of other facts.

Indeed, defendant's argument rips this isolated statement about "quick transactions" out of its proper context.  In full, this paragraph of TFO Quinn's affidavit reads:

> From the Jasper Apartment building, Blunt went to a park nearby. During this and numerous other surveillances, Blunt has been observed meeting with people at this park after leaving the Jasper Apartment building.  These meetings are very quick, in the privacy of Blunt's vehicle, and to me, indicative of narcotics transactions. On this specific date, Blunt was surveilled meeting with two other known local drug traffickers and engaging in quick transactions which I believe, based on my observations and training and experience, to be narcotics-related (exchanging either cash for cocaine or cocaine).  Because he had not yet left for NYC on this date, I believe Blunt was collecting money for cocaine orders.

Quinn Aff. ¶ 45 (emphases omitted).

Viewed in this context, defendant's argument falls apart.  It is common for drug traffickers to use legitimate business relationships to cover up other conduct.  *See, e.g.*, *Peralta*, 361 F. Supp. 3d at 322 (collecting cases explaining defendants often use legitimate ventures as cover for unlawful activities).  So the fact that defendant had another reason to be at the park on July 2 or that the three men have a legitimate business relationship is immaterial, especially in a case where the other two men are known drug traffickers.  As before, TFO Quinn's affidavit appropriately disclosed to the magistrate judge that he was applying his law enforcement training and experience to a set of available facts to draw a conclusion: that unlawful activity was probably occurring inside the vehicle on that specific date.

Further, TFO Quinn's clarifying declaration avers that he was unaware of the nature of defendant's personal relationships with Shelton and Word.  Quinn Decl. ¶ 10.  There is nothing in this record that might establish falsity or knowledge with respect to this issue.  But even if there were, the additional contextual information offered by defendant is immaterial because the totality of the facts and circumstances would still present more than sufficient information to support a

finding of probable cause under the circumstances. *Nejad*, 436 F. Supp. 3d at 722 ("To determine if misrepresentations or omissions are material, a court corrects the errors and then resolves de novo whether the hypothetical corrected affidavit still establishes probable cause.").

### 4. Defendant Slept at the Jasper Apartment

Fourth, defendant contends that the warrant application falsely stated that defendant "frequents the Jasper Apartment numerous times a day but does not stay the night there." Dkt. No. 37-15 at 15 (quoting Quinn Aff. ¶ 25(a)). Defendant submitted an affidavit in which he avers that he "often slept at the apartment overnight." Carry Blunt Aff., Dkt. No. 37-11. A second affidavit from his cousin Charmayne Chatman explains that she leased the apartment but let defendant use it regularly, including to sleep. Chatman Aff., Dkt. No. 37-12. According to defendant, the fact that the execution of the search warrants actually turned up a bunch of defendant's personal items helps to establish this fact. Dkt. No. 37-15 at 15–16. In defendant's view, TFO Quinn's affidavit is misleadingly framed this way to "bolster" their suggestion that it was a stash house. *Id*. at 16.

In opposition, the Government represents that surveillance never saw defendant stay the night at the Jasper Apartment. Dkt. No. 41-6 at 18. The Government points to TFO Quinn's clarifying declaration in support of this motion, which avers that law enforcement never observed defendant spend the night there. Quinn Decl. ¶ 12. The Government also emphasizes that defendant has not offered any evidence tending to suggest that agents might have known otherwise. Dkt. No. 41-6 at 18. But even assuming they did, the Government points out that there is a "mountain of other evidence leading to the conclusion that the Jasper Apartment was [the] stash house." *Id*.

This argument is meritless. First, defendant's generalized assertion that he slept at the Jasper Apartment "often" is hardly enough to satisfy his initial burden of making a "substantial preliminary showing" that TFO Quinn's representation on this point was false or made in reckless

disregard of its truth at the time that it was made to the magistrate judge.  Second, as noted *supra*, this additional information would have been immaterial to the probable cause determination, since TFO Quinn's affidavit offered a host of other reasons to believe that there was a fair probability that the Jasper Apartment was being used as a stash house.

### 5.  The Application Fails to Describe all of Defendant's Bags

Fifth, defendant contends that the search warrant application "relies heavily on agent's observations of Mr. Blunt carrying bags to and from different locations."  Dkt. No. 37-15 at 16 (citation omitted).  In defendant's view, if the search warrant application had "fully disclosed all the times agents saw Mr. Blunt carrying a bag, it would have been clear that Mr. Blunt was acting like every other law-abiding person who carries and ferries bags and objects all day long to different places in service of lawful daily living."  *Id*.  According to defendant, "[t]o help convince the magistrate judge," TFO Quinn "cherry-picked the instances to share."  *Id*.

In opposition, the Government argues there is no requirement that an affidavit set forth every fact observed during an investigation, especially if the fact is irrelevant.  Dkt. No. 41-6 at 19.  In the Government's view, "the purpose of a search warrant affidavit is to provide the court with relevant observations which lead to the ultimate conclusion that evidence of a crime will be found on a person, place, or thing."  *Id*.  According to the Government, this argument does not include any evidence tending to show that TFO Quinn "deliberately hid exculpatory information, or that the affiant was even aware of such information."  *Id*.

This argument is also meritless.  Of course, it is possible to imagine a particular fact pattern in which an agent's conscious decision to omit or mischaracterize evidence that a defendant frequently carried bags to certain locations for entirely lawful purposes (perhaps because the defendant was only a business traveler who often flies with a carry-on bag or merely a food delivery

person carrying restaurant-branded bags to customers) might establish a threshold showing of falsity, knowledge, and materiality requiring a *Franks* hearing.

But this is definitely not that kind of fact pattern.  As the Government points out, defendant has not offered any proof tending to show that TFO Quinn omitted from his affidavit any particular instances in which defendant was observed carrying bags that might bear on the magistrate judge's probable cause determination.  As he does elsewhere, defendant appears to be suggesting that an affiant is obligated to disclose every single detail about every single event that might have been clocked by a group of agents during a months-long investigation.

That is obviously not the law.  And a careful review of the search warrant application confirms that TFO Quinn accurately described the surrounding facts and circumstances that led to his conclusions about instances in which defendant's conduct—such as carrying bags to certain locations in connection with other activities—appeared to be consistent with drug trafficking activity.

## B.  The Probable Cause Determination

In part B of his motion, defendant argues that if you set aside the five categories of alleged misstatements and omissions described above, the search warrant application failed to establish probable cause that defendant was engaged in criminal conduct.  Dkt. No. 37-15 at 17–24.  In support of this argument, defendant nitpicks the details: he says agents were just guessing when they said that cash was in the shoe box on June 11; nothing establishes there was any cash in the bag on July 3; there is no basis on which to conclude that the July 2 meeting in the park was drug-related; the July 14 trip downstate does not follow the "pattern" claimed by the Government; there were innocent explanations for some of defendant's conduct, including that on July 15 he stopped at the Jasper Apartment to drop off some of his personal items; agents were just guessing when they said that the bags contained money on August 6 and 7; none of the controlled drug sales

involving Flagg had anything to do with defendant; some of the search warrant application's language was "confusing and ambiguous" and "improperly suggested" illegal activity to the magistrate judge; it is "absurd" to think that Flagg walked away from the meeting with Blunt on March 21 carrying a kilogram of compressed cocaine in broad daylight.  Dkt. No. 37-15 at 17–24.

The Government has short responses to each of these arguments.  Dkt. No. 41-6 at 20–23. In brief, the Government reiterates each of the relevant portions of TFO Quinn's supporting affidavit and points out that law enforcement agents are entitled to rely on their training and experience, combined with their observations of objective facts and circumstances, to make informed conclusions about probable misconduct.  *See id.*

Defendant has offered a reply in which he further digs into the factual minutiae to try to make it look like the search warrant application misled the magistrate judge.  Dkt. No. 48-1 at 2–10.  Among other things, defendant insists that "TFO Quinn knew that the magistrate judge would need Mr. Blunt *inside* the Hyundai during the travel downstate to link him to the voluminous suspicious trips."  *Id.* at 3 (emphasis in original).  Thus, in defendant's view, "TFO Quinn's decision to tell the magistrate judge that Mr. Blunt was inside the [Hyundai] for each of the [14] trips was therefore purposeful – it was specifically designed to create probable cause in an investigation that was otherwise flimsy."  *Id.* (emphasis in original).

Further, defendant "disputes" whether law enforcement observed him on seven of the trips downstate as stated in TFO Quinn's clarifying declaration.  Dkt. No. 48-1 at 4.  In defendant's view, the language in the affidavit "may be intended to mislead the Court on this issue."  *Id.*  According to defendant, the evidence does not establish anything more than that defendant took a single trip downstate in the Hyundai on July 14–15.  *Id.*

These arguments are rejected for all of the reasons that have been set forth *supra* in Part IV.A of this opinion.  To reiterate: defendant has not carried his burden of making a "substantial preliminary showing" of falsity, knowledge, and materiality as to any of the claimed misstatements or omissions.  Although one misstatement has been identified in Paragraph 23, it is based on TFO Quinn's concession rather than any affirmative showing by defendant.  And while defendant might believe that this acknowledged error, perhaps even standing alone, should entitle him to a *Franks* hearing, a review of the rest of the search warrant application—particularly with Paragraph 23 removed—confirms that ample probable cause still existed to authorize the search warrants.

On this broader question of residual probable cause, defendant insists that TFO Quinn misled the magistrate judge by omitting a host of information (things such as his lawful reasons to be at the park, his innocent use of reusable bags, or, in his reply, the ownership status of the Hyundai) or by garbling together certain details to enhance the appearance of impropriety (things such as controlled buys with Flagg even though defendant was never observed with drugs or more information about the Hyundai's destination once it reached the downstate area).

But these arguments all seem to fundamentally misunderstand where the bar is set for a probable cause determination.  *See, e.g.*, *Florida*, 568 U.S. at 244 (cleaned up) (rejecting "rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach"); *Lauria*, 70 F.4th at 128 (collecting cases explaining that probable cause is about a practical approach to what is fairly probable in light of a totality of the circumstances).

First, contrary to defendant's latest accusation raised in his reply, TFO Quinn correctly represented to the magistrate judge that others had access to the Hyundai, since he averred that at least one unknown subject was seen driving it.  Quinn Aff. ¶¶ 53, 56, 59.  Second, the affidavit describes four quick trips taken by the Hyundai to the downstate area and places defendant in the

vehicle as a driver or passenger at some point during three of them. *Id.* ¶¶ 32–35, 49–50, 53–55, 68–69. Third, the affidavit describes how defendant split his time between the Sunflower Drive address and the Jasper Apartment building, and offered reasons to believe that defendant was using the apartment as a stash house to store money and drugs between trips. *Id.* ¶¶ 24–25, 27–28.

There is no hard-and-fast rule that says a defendant must be seen with drugs to be suspected of being involved in drug trafficking activity. *See, e.g.*, *United States v. Silva*, 146 F.4th 183, 189 (2d Cir. 2025) ("At the warrant-application stage, the government need not prove its case."). The complete pattern of behavior described in the search warrant application, together with the other facts and circumstances detailed by TFO Quinn, including defendant's meetings with Flagg (who sold cocaine to end users such as CS #1) and with other known drug traffickers such as Shelton and Word, was more than enough to establish a fair probability that defendant was involved in drug trafficking activity.

Finally, the Court emphatically rejects defendant's suggestion that there is something improper or misleading about the affidavit's inclusion of Flagg's conduct. *See, e.g.*, Dkt. No. 48-1 at 9. It is patently obvious that not everything in the search warrant application is about establishing defendant's probable involvement in this drug trafficking activity. Recall that Flagg was the original target of the task force investigation. Crucially, the search warrant application did not just seek authorization to search locations connected to defendant; it also sought authorization to search Flagg's Mercedes Benz, his Scoville Avenue address, and his person. *See* Dkt. No. 37-16. In fact, as a result of the evidence obtained from the search warrants authorized by Judge Dancks, Flagg was arrested and charged with, *inter alia*, possession with intent to distribute cocaine base. *United States v. Flagg*, 5:25-CR-496 (FJS).

Flagg's arrest is not mentioned in defendant's papers.  But it would seem that defendant probably knew about, or probably should have known about, Flagg's parallel prosecution.  After all, defendant has recently offered the Court an affidavit from Flagg in which he avers that he is actually defendant's cousin.  Dkt. No. 51.  There, Flagg explains that he was recently sentenced for drug and gun charges in the federal criminal case but never received or bought any drugs from defendant.  *Id*.

Defendant acknowledges that this affidavit is untimely but argues that it should be considered in connection with this motion to suppress because there is no prejudice to the Government in the late submission.  *See* Dkt. No. 51.  The Government disagrees.  Dkt. No. 52.  There, the Government points out that defendant has not offered any cause, let alone good cause, for this late submission.  *Id*.  But even assuming otherwise, the Government argues that Flagg's affidavit is immaterial: TFO Quinn did not aver that defendant and Flagg definitely exchanged drugs but merely opined that they likely did so based on his training, experience, and observations.  *See id*.

Upon review, the Court agrees with the Government.  First, defendant has not offered "good cause" to explain the basis for this late-filed affidavit.[10]  That seems especially problematic here, since the affiant is someone defendant knew or should have known to contact—Flagg is a family member described in detail in the same search warrant application that is the subject of this pending motion to suppress.  Second, on the merits, the Government is correct that Flagg's affidavit does not help place in dispute TFO Quinn's factual averment about the meeting between Flagg and defendant on March 21, 2025, where, as before, TFO Quinn merely offered an inference about likely drug activity based on observations that task force surveillance made of that meeting.  *See* Quinn Aff. ¶ 20.

---

[10]  The Government's response suggests that Flagg might have been reluctant to help out his cousin until after sentencing occurred in his own criminal case.  *See* Dkt. No. 52 at 6.

To somewhat belabor the point: even if TFO Quinn's informed opinion turned out to be wrong as a factual matter (which the Government contests), the question for purposes of a *Franks* hearing would be whether defendant has offered any non-conclusory reason to think that TFO Quinn's inference about what happened between Flagg and Blunt inside the SUV was false or misleading and made with the requisite state of mind at the time that he made it. After that, defendant would still need to show that the misstatement was material to the probable cause determination. Flagg's affidavit, just like all of the other submissions that have been discussed at length *supra*, does not fit this bill.

## V.     CONCLUSION

Defendant has not made the "substantial preliminary showing" necessary to entitle him to a *Franks* hearing.

Therefore, it is

ORDERED that

1. Defendant Carry Blunt's motion to suppress (Dkt. No. 37) is DENIED.

The Clerk of the Court is directed to terminate the pending motion.

**IT IS SO ORDERED.**

Dated:  June 30, 2026
            Utica, New York.

Anthony J. Brindisi
U.S. District Judge